UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHAD CURTIS WHITE,

        Plaintiff,                    CIVIL ACTION NO. 06-11805

       v.                           DISTRICT JUDGE ARTHUR J. TARNOW

JOEL SERVICE, *et al.*,             MAGISTRATE JUDGE VIRGINIA M. MORGAN

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

**I. Introduction**

      This is a *pro se* civil rights action filed under 42 U.S.C. § 1983 in which plaintiff, currently an inmate in the custody of the Michigan Department of Corrections (MDOC), alleges that defendants Joel Service and Brett Smith, both troopers with the Michigan State Police, and defendant Donald Brady, a police officer for the City of Monroe, Michigan, used excessive force upon him during the course of a car chase and while arresting him, in violation of the Fourth Amendment. Plaintiff also alleges state law gross negligence and intentional infliction of emotional distress claims.[1] The matter comes before the court defendant on Officer Brady's

---

[1] Plaintiff is currently serving a sentence of 19 to 50 years' imprisonment on an armed robbery conviction and two one year, sixth month to six year sentences on narcotics possession convictions. According to the MDOC website, the armed robbery occurred two days prior to the events that gave rise to this lawsuit. Plaintiff is also serving a two to five year sentence on a conviction for fleeing the police, third degree. That conviction arose out of the car chase described below.

motion for summary judgment and on a separate motion for summary judgment filed by Troopers Service and Smith.[2]  For the reasons stated below, the court recommends that defendants' motions be **GRANTED** and that plaintiff's complaint be **DISMISSED**.

## II.  Background

The following facts are essentially undisputed.[3]  On April 14, 2004, at approximately 9:30 p.m., Officer Brady, while sitting in a parking lot in his patrol car, observed plaintiff disregard a stop sign in his vehicle.  Officer Brady activated his siren and overhead flashers and attempted to effect a traffic stop.  Plaintiff then sped off in an attempt to elude Officer Brady, and a chase ensued.  In the initial stages of the chase, plaintiff drove the wrong way down a one-way street, ran stop signs and red lights, and reached speeds in excess of 100 miles per hour.  Officer Brady, who had been joined in the pursuit by Officer Foley, was advised by Central Dispatch that plaintiff was driving a stolen vehicle.

Trooper Smith was driving on I-75 in his patrol car when he received information that Officers Brady and Foley were involved in a car chase and that the participants were heading eastbound on South Otter Creek Road.  Trooper Smith exited I-75 at South Otter Creek Road, got out of his patrol car, and retrieved the "stop sticks" from his trunk.  Hearing the sirens

---

[2] Plaintiff filed a pleading entitled "Plaintiff's Motion for Summary Judgment." However, it appears to be a response to defendants' motions and the court will treat it as such. In addition, the court has reviewed the DVD of the entire incident which was submitted as an exhibit.

[3] The facts are drawn primarily from the police reports submitted by defendants and from a DVD showing footage of the chase recorded on the in-car cameras of Officer Brady and fellow Monroe Police Officer Foley.  Plaintiff submitted only a brief declaration containing no detail regarding the events at issue in this case.  Thus, the court had nothing to rely on other than the materials submitted by defendants.

approaching, he determined that he did not have time to deploy the stop sticks. Trooper Smith got back in his vehicle, positioned it in the westbound lane, facing eastbound, and activated his emergency lights and siren in an effort to slow down or stop plaintiff's vehicle. Plaintiff, who was approaching at a high rate of speed, did not slow down, and Trooper Smith had to move his vehicle out of the way to avoid a collision with plaintiff's vehicle.

      The pursuit continued onto the freeway, to the northbound lanes of I-75. As they entered the freeway, plaintiff was immediately followed by Trooper Smith and Trooper Service, who joined the pursuit just prior to the time plaintiff reached the freeway. Officers Brady and Foley also continued their pursuit onto the freeway. After weaving back and forth for a period of time, plaintiff's vehicle eventually collided with Trooper Service's vehicle. The two vehicles remained in contact, with the passenger's side of plaintiff's vehicle touching the driver's side of Trooper Service's vehicle, for over a minute. During that time, Trooper Service repeatedly attempted to push plaintiff's vehicle towards the center median, where there was a concrete wall, while plaintiff repeatedly attempted to push Trooper Service's vehicle off of the right side of the road, which was abutted by a steep embankment. Plaintiff nearly succeeded in pushing Trooper Service's vehicle off of the road on more than one occasion, but Trooper Service was able to repel plaintiff's attempts to do so. After the vehicles had been locked together for approximately one minute, Trooper Service lowered his driver's side window, drew his service weapon, and fired at plaintiff through the rear window of plaintiff's vehicle. Plaintiff then suddenly braked, causing Trooper Service's vehicle, which was still in contact with plaintiff's vehicle, to swerve out of control and careen to the left, striking the center median head-on. Plaintiff's vehicle

continued northbound on the freeway for a short distance before coming to a stop on the right shoulder.

Officer Brady, Officer Foley, and Trooper Smith then drove up to plaintiff's vehicle and exited their vehicles. Officer Brady, approached the driver's side of plaintiff's vehicle and Officer Foley approached the passenger's side. Trooper Smith was also standing in the vicinity of plaintiff's vehicle. It is not altogether clear what occurred after plaintiff stopped his vehicle.[4] The parties offer slightly different versions of the chain of events. This discrepancy will be discussed further below. Suffice it to say that plaintiff either exited or was removed from his vehicle, and that after he was out of the vehicle, Officer Brady used his Taser on plaintiff twice. After the second jolt, Trooper Smith and/or Officer Foley handcuffed plaintiff. The officers realized at that time that plaintiff had been shot. Officer Brady called for an ambulance while Trooper Smith administered first aid. Plaintiff was then taken to a hospital for treatment.

Plaintiff contends that both the shooting and the use of the Taser constituted the use of excessive force and that the officers thereby violated his Fourth Amendment rights. Plaintiff also contends that the officers' conduct constituted gross negligence under Michigan law and that they intentionally inflicted emotional distress upon him. Defendants move for summary judgment, claiming that they are entitled to qualified immunity with respect to plaintiff's § 1983 claims and that he has likewise failed to create a genuine issue of material fact as to his state law claims.

---

[4] Portions of the incident occurred outside camera range.

### III.  Discussion

#### A.  Standards of Review

##### 1. Summary Judgment Standard

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56(b), which states that "[a] party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-movant.  See Matsushita Electric Industrial Co., Ltd. et al. v. Zenith Radio Corp., et. al., 475 U.S. 547, 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see also B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 591-92 (6th Cir. 2001).

The party seeking summary judgment bears the initial burden of "informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).  The movant may satisfy this burden in one of two ways: either "by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating 'an absence of evidence to support the nonmoving party's case.'"  Id. (citation omitted).  Once the moving party has carried this burden, the party opposing the motion "must come forward with specific facts

showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592 (1968)).

### 2. Qualified Immunity

"[G]overnment officials performing discretionary functions enjoy qualified immunity from liability for performance of their official duties." Thomas v. Whalen, 51 F.3d 1285, 1289 (6th Cir. 1995). The doctrine serves to "shield[] an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brosseau v. Hagen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).

In determining whether a government official is entitled to qualified immunity, the first question that must be answered is whether, "[t]aken in the light most favorable to the party asserting the injury...the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If the facts alleged demonstrate that a constitutional violation occurred, the court must then determine whether the right in question was clearly established. Id. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id., 533 U.S. at 202, 121 S.Ct. 2151. The Supreme Court has cautioned that "[t]his inquiry...must be undertaken in light of the specific context of the case, not as a broad general proposition." Id., 533 U.S. at 201, 121 S.Ct. 2151. "If

the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." Brosseau, 543 U.S. at 198, 125 S.Ct. 596.

### B. Fourth Amendment Claims

Excessive force claims arising under the Fourth Amendment are analyzed under a "reasonableness" standard. Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). This standard "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id., 490 U.S. at 397, 109 S.Ct. at 1872 (citing Scott v. United States, 436 U.S. 128, 137-139, 98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168 (1978)). As the Supreme Court indicated in Graham, the determination of whether an officer's use of force constitutes excessive force is a heavily fact dependent inquiry:

> Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,...its proper application requires careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation.

Graham, 490 U.S. at 396, 109 S.Ct. 1865(internal citations and quotations omitted). In reviewing an excessive force claim, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight." Id. Further, the Supreme Court has "specifically noted that police officers may use deadly force to prevent a criminal suspect from escaping when they have probable cause to believe that a suspect poses a threat of serious physical harm to themselves or other members of the community." Dudley v. Eden, 260 F.3d 722, 725 (6th Cir. 2001)(citing Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

Plaintiff has alleged excessive force claims against Officer Brady and Trooper Service. The court will first address plaintiff's claim against Trooper Service. As indicated above, Trooper Service joined in the pursuit initiated by Officer Brady and, during the course of the chase, drew his weapon and fired at plaintiff. As the arresting officers subsequently determined, one or more of Trooper Service's shots found their mark.[5] Trooper Service contends that plaintiff's actions placed the officers and other motorists at risk of death or serious bodily harm and that the use of deadly force was objectively reasonable under the circumstances.[6] In support of his argument, Trooper Service cites Smith v. Freland, 954 F.2d 343 (6th Cir. 1992) and Dudley, supra, 260 F.3d 722, two Sixth Circuit cases involving similar uses of deadly force.

In Smith, a police officer, Officer Schulcz, witnessed an automobile come speeding out of an apartment complex, after which the car ran a stop sign. Officer Schulcz began pursuing the vehicle, and the driver sped off, leading Officer Schulcz on a chase involving speeds in excess of

---

[5] Plaintiff alleges in his complaint that he was shot six times.

[6] There is no question that Trooper Service's use of force constituted a seizure for Fourth Amendment purposes. See Garner, supra, 471 U.S. at 7, 105 S.Ct.1694 ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). Thus, the only question before the court is whether Service acted in an objectively reasonable manner in employing such force.

90 miles per hour. During the chase, Officer Schulcz had to make an evasive maneuver to avoid a collision, and the suspect drove his vehicle at a high rate of speed around the squad car of another officer who had attempted to block the suspect's path. The suspect eventually turned onto a one-way street. When he reached the end of the street, the suspect attempted to turn his car around. Officer Schulcz positioned his car close to the suspect's car in an attempt to prevent him from escaping. Officer Schulcz then got out of his car, intending to remove the suspect from his vehicle. The suspect suddenly backed his car up, then accelerated forward, crashing into Officer Schulcz's vehicle. The suspect backed up again and then attempted to drive around Officer Schulcz's vehicle. As the suspect drove past, Officer Schulcz drew his weapon and fired one shot, which struck and killed the suspect.

The suspect's mother filed a § 1983 action against Officer Schulcz and others, claiming, among other things, that Officer Schulcz's use of deadly force was excessive and unreasonable. The district court granted Officer Schulcz's motion for summary judgment, concluding that his use of force was objectively reasonable. On appeal, the Sixth Circuit affirmed, stating the following:

> In light of these cases, and after a careful scrutiny of the facts, we are convinced that summary judgment should be granted to Officer Schulcz. After a dramatic chase, Officer Schulcz appeared to have trapped this man at the end of a dark street. Suddenly, Mr. Smith freed his car and began speeding down the street. In an instant, Officer Schulcz had to decide whether to allow his suspect to escape. He decided to stop him, and no rational jury could say he acted unreasonably. Even if there were a roadblock at the end of Woodbine Avenue, Officer Schulcz could reasonably believe that Mr. Smith could escape the roadblock, as he had escaped several times previously. In any event, Mr. Smith had freed his car from Officer Schulcz's attempted blockade, and was undoubtedly going

> to escape from Officer Schulcz, if not the entire police force. Had he proceeded unmolested down Woodbine Avenue, he posed a major threat to the officers manning the roadblock. Even unarmed, he was not harmless; a car can be a deadly weapon. Finally, rather than confronting the roadblock, he could have stopped his car and entered one of the neighboring houses, hoping to take hostages. Mr. Smith had proven he would do almost anything to avoid capture; Officer Schulcz could certainly assume he would not stop at threatening others.

Smith, 954 F.2d at 347 (internal citation omitted).

In Dudley, the would-be plaintiff waked into a bank and ordered a teller give him some money. After receiving the money, the plaintiff, who was unarmed, drove a stolen vehicle to the parking lot of a bar and waited for the police to arrive, apparently planning to "commit suicide by way of police intervention." Id., 260 F.3d at 723. In response to a dispatch, Officer Lewis proceeded to the bar, where he found the plaintiff sitting in the stolen automobile. Officer Lewis approached the plaintiff's car with his gun drawn and ordered the plaintiff to get out. The plaintiff ignored the order and sped off when Officer Lewis reached into the car to unlock the door. Officer Lewis and two fellow officers, who had joined Officer Lewis shortly after his arrival at the bar, shot at the plaintiff's tires, striking at least one of them. Officer Eden, who saw the plaintiff accelerate out of the parking lot and heard shots fired upon his arrival, took chase. After a brief pursuit, the plaintiff's vehicle collided with Officer Eden's vehicle, bringing the cars to a stop. When the cars were either nearly stopped or fully stopped, Officer Eden drew his weapon and shot at the plaintiff, hitting him at least once.

The plaintiff filed a § 1983 action against Officer Eden and others, alleging a Fourth Amendment excessive force claim. The district court granted summary judgment to Officer

-10-

Eden.  The Sixth Circuit affirmed, concluding that Officer Eden acted in an objectively reasonable manner under the circumstances: "Given Dudley's bank robbery, his refusal to comply with the commands of armed policemen, his attempt to evade arrest, and his reckless driving, it was reasonable for Officer Eden to conclude that Dudley posed a serious threat to himself and others."  Dudley, 260 F.3d at 727.  The Court also noted that Officer Eden was forced to act quickly in a rapidly evolving situation and that while the plaintiff was unarmed and had no intention of killing anyone, Officer Eden had no way to know that at the time.  In addition, the court found that the fact that the cars were either stopped or nearly stopped when Officer Eden fired at plaintiff did not decrease the threat that the plaintiff posed because he could simply have put his car in reverse and accelerated away and, moreover, if plaintiff was armed, he would have had a clear shot at Officer Eden given the relative position of the two vehicles.  Based on all of these factors, the Sixth Circuit determined that Officer Eden was entitled to summary judgment.

Comparing the facts of Smith and Dudley to the facts of this case, the court has little trouble concluding that Trooper Service's use of deadly force to end the pursuit was objectively reasonable.  Plaintiff, driving a stolen vehicle, led Trooper Service and three other officers on an extended chase over city streets and onto the interstate.  During the chase, plaintiff ran red lights and stop signs and reached speeds in excess of 100 miles per hour, placing the officers and other motorists at great peril.  Trooper Smith, who had set up a partial roadblock on a surface street, had to take evasive action to avoid being struck by plaintiff's speeding vehicle.  When he neared the interstate, plaintiff briefly drove the wrong way down an exit ramp then veered across a

-11-

grassy median to the entrance ramp of the highway. Once on the highway, plaintiff continued to drive recklessly, and when his car came into contact with Trooper Service's vehicle, plaintiff attempted to push Trooper Service's vehicle off of the right side of the road and down a steep embankment on more than one occasion. Plaintiff nearly succeeded in his attempts to do so. All of this occurred at between 60 and 70 miles per hour. In light of the extraordinarily reckless manner in which plaintiff was driving his car and his apparent willingness to do anything to evade apprehension regardless of the safety of others, Trooper Service was well justified in believing that plaintiff would continue to pose a serious risk of harm to the officers involved in the chase and other motorists if the chase was not ended promptly. Under these circumstances, Trooper Service's use of deadly force was objectively reasonable.

Further, even if Trooper Service's use of deadly force could be deemed unreasonable, he would still be entitled to summary judgment on qualified immunity grounds because the law did not clearly establish at the time of the shooting that Trooper Service's actions constituted the use of excessive force. In determining whether a constitutional right is clearly established for qualified immunity purposes, the court must "look first to the decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." Buckner v. Kilgore, 36 F.3d 536, 539 (6th Cir. 1994); see also Dickerson v. McClellan, 101 F.3d 1151, 1158 (6th Cir. 1996).

Plaintiff has pointed the court to no case in which an officer was found have violated the Fourth Amendment under circumstances similar to those present in this case, and the court's research has revealed none. Rather, the cases cited above, and other Sixth Circuit cases, suggest

that Trooper Service's actions were entirely reasonable.  See, e.g., Scott v. Clay County, Tenn., 205 F.3d 867 (6th Cir. 2000).[7]  The most that might be said of Trooper Service's conduct is that it fell within the "hazy border between excessive and acceptable force."  Brosseau, 543 U.S. at 198, 125 S.Ct. 596 (quoting Saucier, 533 U.S. at 206, 121 S.Ct. 2151).  It certainly cannot be said that Trooper Service's use of deadly force under the circumstances he faced was clearly unlawful under prevailing case law.

Turning to plaintiff's excessive force claim against Officer Brady, the court must first determine whether his use of the Taser upon plaintiff was objectively reasonable.  When making an arrest, an officer has "the right to use some degree of physical coercion or threat thereof to effect it."  Graham, 490 U.S. at 396, 109 S.Ct. 1865.  As discussed above, in determining whether an officer's use of force in effecting an arrest was objectively reasonable, the court must pay "careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id.  Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation."  Id.

The footage taken from Officer Brady's in-car camera shows plaintiff pulling his vehicle over to the shoulder of the road and stopping after the shooting, sticking his left hand out the

---

[7]There are certainly no United States Supreme Court cases clearly establishing that Officer Brady's actions were objectively unreasonable.

-13-

driver's side window, and waving his hand. After a few seconds, one of the officers – presumably Officer Brady – opened the driver's side door of plaintiff's vehicle, and plaintiff either got out or was removed from his car. Almost immediately, plaintiff fell to the ground. How he got there is not altogether clear. Unfortunately, neither the in-car camera in Officer Brady's patrol vehicle nor the camera in Officer Foley's vehicle fully captured the events that occurred after plaintiff stopped his vehicle, and the audio portion of the footage taken from Officer's Foley's vehicle is not particularly illuminating.[8] Officer Brady's report of the incident contains the following description of what occurred after plaintiff stopped his vehicle:

> Officer Brady immediately drew the service weapon and ordered the suspect not to move. Cpl. Foley was observed on the passenger side of the suspect vehicle and Trooper Smith was observed somewhere near the driver's side.
>
> The suspect ignored orders not to move. Officer Brady had now gotten the Taser ready to be deployed. The suspect began to exit the vehicle. His right hand was lagging behind his body and was hidden from view.
>
> Due to the circumstances of the pursuit, the many lives that the suspect endangered and the safety of the officers involved, Officer Brady immediately deployed the Taser. It had an immediate disabling effect on the suspect. He fell to the ground outside of the drivers door of the suspect vehicle. Officer Brady told the suspect not to move. Once the initial 5 second deployment was done, the suspect appeared to be attempting to get up. Officer Brady advised officers that another deployment of the Taser was going to be done. Officer Brady delivered a second 5 second Taser deployment. At this time, Trooper Smith and Cpl. Foley were able to handcuff the suspect behind his back.

Officer Foley offers a substantially similar version of the facts:

---

[8]The in-car footage from Officer's Brady's vehicle has no audio component.

> Upon coming to [a] stop, officer was behind officer Brady who was now closest to the suspect vehicle. The suspect put his left hand out the window. Officer began to approach on the passenger side of the vehicle. Officer Brady was ordering suspect to the ground. He did not comply and officer Brady utilized his Taser on the suspect. Officer proceeded to the driver's side of the vehicle. Trooper Smith was already at that location. Officer Brady notified officers that it was safe to touch the suspect. Officer reached down to grab the suspect's right arm/shoulder and immediately noted that he was bleeding. Officer advised the other two officers of the suspect's bleeding. Trooper Smith took precautions at that time (rubber gloves) and handcuffed the suspect.

Plaintiff offers a very brief and somewhat different version of the facts in the declaration he submitted in support of his response to defendants' motions. He states the following:

> "5. Upon the vehicle's seperating the plaintiff pulled over shortly thereafter, rasing his hands out the car window clearly surrendering.
>
> 6. When the defendant(s) approached plaintiff's car and ordered he out, and on the ground, he complied none violently. The defendant(s) then used unnecessary force by tasering the injured plaintiff two (2) times in addition to being shot...."

(Spelling errors and syntax as stated by plaintiff in his Response) Thus, Officer Brady claims that he tasered plaintiff the first time while plaintiff was still standing up because plaintiff ignored his order to not move and that he tasered plaintiff a second time when it appeared that plaintiff was attempting to get up. Plaintiff claims, to the contrary, that he had submitted to the authority of Officer Brady and the other officers and that he was tasered while laying on the ground.

     Viewing the facts in a light most favorable to plaintiff, the court concludes that Officer Brady acted reasonably in using his Taser upon plaintiff. As discussed above, plaintiff, driving a

stolen vehicle, led Officer Brady and the other officers on an extended (8 to 9 minutes) and dangerous high-speed chase, during which he showed utter disregard for the safety of the officers and other motorists and pedestrians, attempted to run Trooper Service off of the road, and amply demonstrated that he would do anything to evade capture. The pursuit ended only because Trooper Service shot plaintiff. When Officer Brady approached plaintiff's vehicle, he had no way to know whether plaintiff possessed a weapon or whether he was under the influence of drugs and/or alcohol, and there is no evidence showing that Officer Brady was aware when he first approached plaintiff's vehicle that plaintiff had been shot. Even if plaintiff got out of his vehicle and lay down on the ground as he asserts, it cannot be said that it was unreasonable for Officer Brady to use his Taser. Plaintiff was not yet handcuffed or otherwise under the control of the officers. Given plaintiff's extraordinary attempts to evade capture, and not knowing that plaintiff had been shot or that he was unarmed, Officer Brady could have reasonably believed that plaintiff might attempt to get up and flee, reach for a weapon, or even attempt to assault Officer Brady in a renewed attempt to escape. The initial use of the Taser to eliminate those risks and ensure that plaintiff would remain on the ground until he could be securely handcuffed was reasonable under the circumstances.

    As for Officer Brady's use of the Taser a second time, it is undisputed that the second jolt, like the first, came before plaintiff was handcuffed. Plaintiff has presented no evidence to rebut Officer Brady's assertion that he tried to get off the ground following the first Taser jolt. Not knowing plaintiff's intentions, and considering his prior conduct, Officer Brady was justified in using the Taser a second time to prevent plaintiff from getting up. It bears noting that Officer

Brady refrained from using his baton or from applying other physical force that might have caused serious injury. Rather, Officer Brady used his Taser to incapacitate a dangerous individual until he could be safely handcuffed and inflicted no lasting injuries in so doing. While it is a close call on this scant record, the court concludes that Officer Brady's use of force was reasonable under the rapidly evolving circumstances he faced and that he employed a proportionate amount of force in ensuring that plaintiff presented no further risk to him or the other officers until plaintiff could be handcuffed or otherwise fully brought under control.

Further, the court concludes that Officer Brady is entitled to qualified immunity even if his use of force was unreasonable. As before, plaintiff has pointed to no case law clearly establishing that Officer Brady's use of the Taser was objectively unreasonable under the circumstances, and the court's research has revealed none. The court is aware of only one case in which the Sixth Circuit addressed the question of whether an officer's use of a Taser upon a suspect constituted the use of excessive force in violation of the Fourth Amendment. In that case, Rosseau v. City of Cincinnati, 953 F.2d 1036 (6th Cir. 1992), an officer used a Taser to subdue a homicidal and suicidal individual who was armed with knives and who had made several threatening statements to the officers. The Sixth Circuit declined to reach the question of whether the officer's use of the Taser was reasonable, concluding that the officer was entitled to qualified immunity because there was no case law clearly establishing that the officer's conduct

was unlawful. Id. at 1044-45.[9] Thus, Rousseau provides no basis for concluding that Officer Brady's conduct was clearly unlawful, and there are no Supreme Court or out-of-circuit cases clearly demonstrating the unlawfulness of his actions.

Further, there are no analogous Supreme Court, Sixth Circuit, or out-of-circuit cases clearly demonstrating the illegality of Officer Brady's use of the Taser. The Sixth Circuit has held that "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional." Bultema v. Benzie County, 146 Fed.Appx. 28, 35-36 (6th Cir. 2005)(concluding that officer acted in objectively unreasonable manner where he used pepper spray on individual who had already been handcuffed and "could barely stand upright"); see also Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir. 2004)(concluding that it was constitutionally unreasonable for officers to continue to pepper spray suspect who was immobilized by handcuffs and a hobbling device and had stopped resisting arrest); McDowell v. Rogers, 863 F.2d 1302 (6th Cir. 1988)(finding that unprovoked use of night stick on suspect who was already handcuffed would constitute use of excessive force under Fourth Amendment). However, these cases are readily distinguishable from the present matter and provide no basis for concluding that Officer Brady violated plaintiff's clearly established Fourth Amendment rights. In each of these cases, the suspect had been handcuffed and no longer presented any threat to the officers. As discussed above, both Taser jolts were administered before plaintiff was

---

[9]In Caldwell v. Moore, 968 F.2d 595 (6th Cir. 1992), the Sixth Circuit addressed the question of whether the use of a "stun gun" to subdue an unruly inmate violated the inmate's Eighth Amendment right to be free of cruel and unusual punishment. The Court concluded that no Eight Amendment violation had occurred. The court mentions the case only to note that Rousseau is not the only case in which the Sixth Circuit addressed the use of a Taser or Taser-like device by law enforcement personnel. There is certainly nothing in Caldwell to suggest that Officer Brady's use of a Taser on plaintiff was unlawful.

handcuffed, and it was reasonable for Officer Brady to believe, given plaintiff's extraordinary attempts to evade capture and arrest, that plaintiff continued to pose a threat until he was handcuffed or otherwise fully subdued by the arresting officers.

For the reasons discussed above, the court concludes that Officer Brady's use of the Taser was objectively reasonable under the circumstances and, therefore, that he is entitled to summary judgment and qualified immunity. Alternatively, the court concludes that even if Officer Brady's conduct could be deemed unreasonable, he is nonetheless entitled to summary judgment on qualified immunity grounds because there is no case law clearly establishing that his actions were unlawful.

### C. Trooper Smith

Plaintiff named Trooper Smith as a defendant in this matter, but alleged no discernable claim against him in the complaint. Accordingly, the complaint should be dismissed as to Trooper Smith.

### D. State Law Claims

Having concluded that defendants are entitled to summary judgment with respect to plaintiff's § 1983 claims, the court recommends, in accordance with 28 U.S.C. § 1367(c)(3), that the district court decline to exercise supplemental jurisdiction over plaintiff's state law claims.

## V. Conclusion

For the reasons stated above, the court recommends that defendants' motions for summary judgment be **GRANTED**, that plaintiff's § 1983 claims be **DISMISSED WITH PREJUDICE**, and that his state law claims be **DISMISSED WITHOUT PREJUDICE**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of Trooper Service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of Trooper Service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

```
                                        S/VIRGINIA M. MORGAN
                                        VIRGINIA M. MORGAN
Dated: November 30, 2006                UNITED STATES MAGISTRATE JUDGE
```

The undersigned certifies that the foregoing Report and Recommendation was served upon Chad Curtis White # 202733 @ E.C. Brooks Correctional Facility/West Shoreline Correctional Facility, 2500 S. Sheridan Drive, Muskegon Heights, MI 49444 and Counsel of Record via the Courts ECF System and/or U.S. Mail on November 30, 2006.